Thank you, Your Honor. May it please the court, counsel. This case is a case that involves the court's de novo review. My name is Kyle Torvanen. I represent the appellant who is the plaintiff below. Her name is Noelle Michaud. She's a personal injury victim. She's present in court with me today. And the first thing that I would like to talk about is that this case, on its facts, seeks to turn what is the public policy, not only of the state of Minnesota, but of all of the states that I'm aware of, of compensating tort victims that are injured in accidents, especially those that are of no fault of their own, and do everything right regarding service of process. And it takes that policy and it turns that policy on its head so that essentially the service of process statute is the attempt here is to have that be used essentially as a sword to take away the ability and the right of the injured victim to have their day in court. Now let me turn to the specifics. I also won't reiterate the facts. I know the counsel, I'm going to ask you a question even about your opening, which is that I authored in my former position one of the opinions you referenced, which is the Yeager, the Yeager versus Palladium Holdings gets at that. And that opinion says that when it comes to service of process, the policy of the Minnesota rules is strict compliance. You have to strictly comply with the requirements of service. And so it's not a matter of depriving folks of their recovery. It's a matter of making sure that there's notice given and that the rules are complied with. What's your response to that? I understand the question, your honor. Thank you. I believe that the response to that is that there is strict compliance in this case. I'm not asserting that that is a policy that trumps the service of statute or the service of process rules. Rather, it's a lens through which the overall, this court is in part a policy-making court. And I just ask the court to keep in mind that as we look at the compliance with those statutes, that if there is in fact strict compliance, which will be part of the argument that I will submit to the court, that we shouldn't forget about the lens of due compensation of tort victims. So in this case, it was a car accident. My client was seriously injured. The defendant was a very young woman who was in college at the time. And all of the indicia when it came time for service of process, intentionally by the facts in this case, all indicia were that she lived at 115 Forest View in Lake Bluff, Illinois. I'll refer to that as 115. That included every, every factual indicia, including driver's licenses, insurance policies, school materials, voting records. And she testified that she left those things there intentionally. The first argument that we would make is that with that failure and with the known policy of Minnesota that an intent to return is a big issue, is an important issue, as multiple of the cases cite, that she in fact did live at 115 even though she apparently rented a small room. It didn't have other facilities. It was a room at a home that was owned by someone else, which she testified that she took that room because it was convenient between her job, allowed her access her familial home, which her father referred to as her home. Didn't she submit a declaration saying I had no intention of returning to what we'll call the family home? She did submit a declaration indicating that. However, both she and her father testified in a little bit different language, but essentially that there was an intent to return home every weekend. Is that the same as an intent to return? Those seem to be pretty significant differences because if it's an intent to return home every weekend, are you suggesting that she would have two usual places of abode, that Minnesota would recognize that someone could have two? Well, that question is one of the things that I'm here to address with the court today because it is a question of first impression in the state of Minnesota whether you can have two places of abode. The dictionary definition of usual place of abode, and I think if we again look at policy as to what this is meant to accomplish, it's to get actual process and notice into the hands of someone so that they're afforded due process. If they're in two different locations, but they're going to be there regularly, and you know that they're going to be there regularly, it satisfies the requirement of trying to afford due process to the defendant as long as we know that they're going to return. If the family home is her usual place of abode, do we have to conclude that she has two? I mean, is that your argument, she has two? That is. So you're not saying it's the family home to the exclusion of the rental spot? That's correct. Counsel, I want to ask you again to reference the Yeager, and this goes to Judge Kelly's line of questioning too. Yeager was then residing therein, that portion of Rule 4 of the Minnesota Rules of Civil Procedure, but in Yeager, it analyzed a case dealing with a college student returning home, and we said, or the court said in that opinion, the Minnesota Supreme Court said in that opinion that returning home from college is different. It gets kind of to the point that it's sort of returning home every weekend, because when you're returning home from college, you have an intent to return over the long term. What's the relevance of that analogy that was made in the Yeager case? Realizing it was interpreting slightly different language. How would you interpret that? And I realize you may not have it sitting in front of you, but I think the analogy is still there, and I would ask you to distinguish it. Well, I think Magistrate Judge Brisbois actually raised that question too, whether there was a distinction, and I said the distinction, if the distinction between proper service and non-proper service, when we know that a college student is returning home versus a person who says that they're returning home that just doesn't make sense. I think we're splitting hairs that border on the theater of the absurd, in my opinion, and I argued to Magistrate Judge Brisbois that it is akin to the college student cases. There are other college student cases, too, that talk about an intent to return while you're in college is sufficient for that to be your usual place of abode. Whether that, because it is an issue of first impression, whether that makes it her actual place of abode because she intends to return, or whether there's two places of abode but she still intends to return, the argument that I'm making is that an intent to return is one of the requirements, or not one of the requirements, excuse me, one of the policies, because a lot of the cases that are out there, including the one that's most often, or was cited as most prominent by opposing counsel, Lundgren versus Green, these are all cases where the person has no intention to return. That was a medical malpractice case where the husband, it was a doctor who got divorced and left with no intention to return, and he in fact found out about the case from the practice group that he was with because they were a co-defendant later on. Well, let me, I'm going to get on my original question a little differently. We've got the college student example, but usual place of abode, what's the relevance of the fact that the plural form of places is not used? In other words, it seems that the rule, and again, we're talking about strictly complying, usual place of abode seems to refer to one place. I guess to ask Judge Kelly's question, my question in a slightly different way, can there really only be one usual place of abode versus places of abode? That was a, that is a question that I wasn't prepared for, but what I would argue to that, your honor, is that it doesn't require plural because usual modifies the term place. You can, usual, the term usual as used in that instance talks about the regularity and where you may be on any given basis, as does the dictionary definition, and so I think the policy is most satisfied by having, you could have a place of abode that you were away from forever. I mean, this was the place that you intended to return someday, but you're going to be gone for a long time. Is the policy better satisfied by saying that that has to be the place, even though you're never going to end up with actual service, or is it better satisfied by saying, I'm now laying my head at my sister's house, but I'm doing that for six months. Does that become your usual place of abode so that you actually end up with the service of process, which is the due process that we're looking for out of rules three and four of the Minnesota Rules of Service? Well, to follow up on that, does that mean then that if it is singular, I know you're arguing it shouldn't just be one, but if they would, under your theory, if they would have served her at her, I think she got the rental room off of Craig's list, if they would have served her at the rental room or at the rental house or whatever, would that service have been improper? No, I don't believe it would have been improper. So it really does require then for there to be two usual places of abode here, that we have to construe that language as including the fact that there could be two places of abode. I agree with that. I think the usual, I think the term usual honors that concept. Thank you. Well, let me let me ask you this and see what you from the Minnesota Supreme Court does to your, the statement you just made, and this is Berryhill against Sepp, and it says, it's talking about this term usual place of abode, and getting right to the quote, it says, the purpose of the use of the term in an act relating to the service of process has primary reference to the place where the defendant is usually to be found. Now how can, how can you say that someone is the place where, where the defendant usually is to be found? Isn't that by definition a singular reference to a singular place, the place where the defendant is usually to be found? I would say no, and the reason I would say that respectfully, your honor, is that I don't believe that the Berryhill court was addressing this circumstance, and I think that we're we're splitting the words very carefully. I would focus in that very quote on the place where you're usually to be found. In this instance, she's usually to be found every weekend at her parents home, and you know, if she's found someplace else during the weekdays, then it goes to the issue of whether there can be two places of abode. So usually, so you say usually, here refers to two days out of the seven day week. That's correct. Based on the testimony, there was an intent to return every weekend, and her father said she did because the location she stayed had no facilities. There was no ability to do laundry, those types of things, so she returned every weekend and was served, in fact, on the weekend. I think that I will reserve the remainder of my time because I believe that the court may have other questions for me after this is done. Thank you. Morning, Your Honors. May I proceed? Thank you, Your Honor. Your Honors, I'll be brief. I believe Magistrate Brisbois' order was clear, concise, and well-written. There is no dispute to the actual facts in this case. The sheriff goes to the defendant of Pelley Davidson's father's house, says, here you go. Does Miss Davidson live here? And the father says no, or he doesn't say no, he says she'll be home later tonight, and the sheriff drops it off. There's no dispute that Miss Davidson wasn't living at her parents house the majority of the time here. She moved out a half a year before. She had a lease agreement. She would come home frequently on weekends, but not every weekend, and she might stay a night. So to the extent that it was two days out of every week, I think the facts don't support that. I think it was maybe all night on a weekend, frequently, but not always. Now plaintiff's counsel argues what I believe to be two questions of law and one question of fact. The first one is, does Minnesota's usual place of abode standard permit more than one place? Counsel, before you get into the core of your argument, I want to explore, and I didn't really ask counsel about it, but you know, I was on the Melillo versus Heitland case, and the issue of personal delivery came up, whether the mail handler, the postal worker, could affect personal delivery. And there's a line in Melillo that says that the reason why the mail handler, the postal worker, did not affect personal delivery is because there was no intent to serve. And here, arguably, the father, in his I'll deliver that later tonight. And so arguably, the father here had an intent to serve. Now, I know that there's other older cases that suggest that there is no secondhand delivery. But how do we square that with Melillo? And is there any legs? Tell me why there's not legs to the argument that the father affected personal delivery under the Melillo dicta. Thank you, Your Honor. I'm not specifically aware of the Melillo facts, but going on what you're told me, and based on the other cases that were cited in this court, such as Thiel v. Stedge and the Peterson and Lunger matters, first of all, how can you say that the father has intent to serve when he doesn't even understand what's going on? The sheriff says, does Miss Davidson live here? And he says, well, she'll be coming over tonight because he's not a lawyer. He doesn't understand the nuances of the usual places of abode. He's got documents. Who's to say what he knows what they are? I think it boggles the mind to think that her father would intentionally serve some act to commencing a lawsuit against his own daughter. What about the... I'm sorry, just to interrupt right there and I'll let you continue on, but he did say he told me what it was about and then he left. So I think there is something in the record that I'm not sure it's entirely ludicrous to think that he understood that the sheriff was here to serve. He told me what it was about and I said, yeah, I'll give it to her. Okay. And he said he told it was about, but he didn't actually explain what it was about or what his understanding of it was. He could have said these are legal papers for your daughter and that's what he said he told it was about. He doesn't specifically state anywhere in his deposition testimony. I understood it to be as some as a complaint and that by handing it to her, I was commencing the lawsuit and perfecting the service. Well, but one of the problems you have is this is an in between case because Malilo, the reason why it didn't have legs was because the sheriff was delivering a letter or whatever it was, had no idea what it was. And so how can you have the intent to serve something that you don't know what it was? But here you at least have knowledge of what it is, general knowledge. And so does that kind of put you in the middle ground and what do we do with that? I don't think it does because we've got a number of other cases in which almost identical fact patterns have existed where someone hands to someone a some as a complaint. And when you perfect service on someone, you can't just say, here you go. You say, I'm handing you some as a complaint. So everyone in all of these similar example cases knew to the same extent as the father in this case what it was and pass it on to the next person. And we see that in times past, the court has not held that that to be valid. In the OV Stitch, for example, it gave it to the secretary and granted the court case does not specifically analyze, did the secretary specifically hand it to the other worker, but we can presume so that it was argued that those other cases have at least implicitly, if not explicitly in the prior briefing, which wasn't addressed in the appellant's briefing, rejected that argument. Furthermore, to the extent that it was addressed in the court's prior orders, and I know that it was referenced in a 1947 order, it was never upheld. It was dicta in all of those cases, which means that it's not precedential value for the court to rule on today. So let's assume that for purposes of this question, that the sufficient knowledge. Is that good enough? I mean, why isn't that good enough? I guess I'm probing because it seems to be that there's a couple of ways under the rule that you can serve someone, and it's personal, direct, or substitute. And I'm trying to get at whether Minnesota would allow for some kind of the secondhand direct, right, personal. And so if you've got the intent factor taken care of, what in the rule prohibits the father from being the process server? I would say there's nothing explicitly in the rule, but that the Minnesota Supreme Court has addressed the same set of facts countless times and precluded it. There's a case law saying that almost identical to this, that by handing it to . . . The Berryhill? Berryhill. Wasn't that, though, looking at substitute service? I'm just wondering if this has been entirely precluded by Minnesota law, or whether either it hasn't been addressed directly under the personal service prong, or in the alternative, whether the Minnesota Supreme Court has only spoken to it in dicta. And I'm curious what your thoughts are on that. And that's fine. If you don't have thoughts, you can move on to another point that you'd like to make. I'm sorry, Your Honor. I'll keep talking, and hopefully I find the right site as I move along. Was there knowledge of the lawsuit obtained from another source? Is that a factor here? Does that play at all in this case? No, Your Honor. It requires strict compliance, not actual knowledge. I know your position, but factually, did the defendant in the lawsuit know of the lawsuit otherwise? No, Your Honor. This accident happened over six years before she was given this lawsuit. I doubt that they even . . . I doubt the father, who wasn't there at the time, even remembered that it had happened to his daughter over six years prior there, too. And there is no evidence at the scope of appeal right now to indicate otherwise. If I find that citation, I will reference it later on, Your Honor. But again, I would just rely on the cumulative case law involving the same set of facts, and that the Minnesota Supreme Court has not yet adopted that. Can I push you a little bit on the intent issue? The deputy sheriff that something, but what's the extent of the requirement that they have particular knowledge that you seem to be inferring that . . . or implying that the father should know? In other words, while he may know it's legal papers, but he doesn't know the details. Do you think the deputy sheriff needs to know that as well? I believe that he has to have some understanding as to what he's serving so that he can comply with the rules of procedure. He has to know who he's service or substitute service. So I think it it does depend. I'm frankly I'm not familiar with enough areas of law, such as I've never practiced family law or criminal law, so I don't know if that's requires a different level of understanding as of what in this case. You know, I'm not going to get off the personal delivery, but you know there is an element of unfairness here. I mean, I think you would probably agree on that, which is you give it to the deputy sheriff, which is what you're supposed to do under the rules. The deputy sheriff takes it. The deputy sheriff, who's not an agent of the plaintiff, messes up. Serves it in the wrong place essentially. Didn't ask the right questions. Didn't ask precisely the right questions. And I understand there's a competing due process narrative, which is that you know the defendant in the putative action didn't receive notice. But there is an element of unfairness because it becomes it gets out of the plaintiff's control completely when it goes to the deputy sheriff, one would think. And so could you address that a bit as well? Just the element of unfairness to the plaintiff, who did everything, almost everything she was supposed to do. I think that's part of the nature of the law, is that there's always a little bit unfairness at the at the edges. I mean, if someone who waits one extra day to serve a substance complaint is completely barred by the statute of limitations, those are the rules. Failure to respond to requests for omissions within 30 days is barred. In this case, the plaintiff was aware of her injuries for over six years. She had six years to commence this lawsuit. Instead, she waited until a few days before the statute of limitations ran and relied on a 60-day extension, which has limitations with the sheriff. This lawsuit could have been perfected earlier time. Furthermore, as the appellant argues in her brief, once it was delivered to the sheriff, service could have been perfected in other manners, such as service by publication. They had other avenues to protect themselves within that 60-day window of a failure for the service to be perfected. Well, you asked the question about knowledge. She did learn. Well, isn't it kind of an agreed fact here that the father, when she went to the father's house for dinner, he told her about the visit of the officer and that the papers had been received? Yes, she did receive the papers. Whether he knew what those papers meant or not, as representing . . . So, for whatever it's worth, it's not a situation where deputy gives the papers to the father and then he forgets about them. He tucks them away and forgets, never mentions them to anybody, right? Instead, that very day, he in essence served the papers on the daughter, on the defendant. Well, I wouldn't use the terminology that he served the papers on the table and said, oh, by the way, there's something on the kitchen table for you. Is that the proper service that we need? And furthermore, I could talk more about that, Your Honor, but to go back to your point, I want to address one more thing of unfairness. The defendant in this case, to perfect the removal to federal court, did serve an answer and that answer did allege that there was insufficient service of process and violation of statute of limitations within its 20 days. So, they still had an additional 20 days thereafter to complete that service. Finally, Your Honor, I'm more than happy to address any more questions, but I have two minutes and 30 seconds left just to round up the facts of this case. First of all, with regard to two usual places of board, I think as Your Honor has questioned earlier, there is no Minnesota case law to sustain that. Every case law that's supported is from another state. I make the same arguments with regard to secondhand service that if the Minnesota Supreme Court wants to create new law to allow the service of secondhand service, they may do so, but they have not chose to do so in the history of Minnesota yet. Finally, with regard to the determination as to what the usual place of abode was, it was clearly where she was renting. She had moved out all of her things out of her bedroom. The intent to return that was argued is an intent to return to live, not a return to visit. I was 25 years old once, and I went over to my parents' house for dinner too because I couldn't afford the great dinners that they would serve and the home-cooked meals. That didn't mean that I was living there at the time. I agree with you. I just would add one thing. Was there at least a genuine issue of material fact about that, which is to say that if you can have two usual places of abode, she kept a lot of her documents, the key address being the parents' home, you know, driver's license. All these things were going to her parents' homes, which indicates or could indicate an intent to return to live, not just an intent to return to visit. There's no dispute as to any of the evidence here and how that is argued is obviously argued differently. She did have some of her official addresses still at her old house, and her testimony was that it slowly changed over time. As a 25-year-old myself, I was remiss on updating my address the minute I left an apartment or my parents' house. It took me a while to get a mailing address. I think my parents still got magazines a decade after I had moved out, but the test is where she is actually living, and her testimony, her father's testimony, is that they cleaned out the bedroom, you know. She took her back in with her parents. She's 25 years old, wasn't a college student. I think clearly the weight of the evidence is that it was not a clearly erroneous decision by Magistrate Prisboi that she did not intend to move in. That was not her usual place of abode. Thank you, Your Honors. Counsel? I would like to use the limited time I have to try to address some of the things that I think were brought up by the court's questioning. In terms of the Melillo case that was raised, the quote that was being proffered is, we've required that the process server know that a summons is being served and tend to serve it. That factual scenario is addressed at some length at pages 5 and 6 on to 7 of the original brief. Thomas factually, just quick factual argument, Thomas, her father, said that Deputy Sobrano was real nice and explained what all of the paperwork was to Thomas. He asked, Deputy Sobrano asked him if he would hand the process documents to Sarah when she returned home and Thomas told Deputy Sobrano that he would and he did. When he arrived, her father, who by then had looked over the document again himself, duly handed those documents to Sarah, indicating that he had indeed been served with them. They related to the accident that she was in in 2010 and handed her the documents, at which point, recognizing both of them talking that they were about the 2010 accident, they sat down together and contacted the insurance agent. I don't think there's any question, based on that series of facts, that Thomas understood what it was that he had and it meets all of the strict secondhand service strict compliance requirements with Minnesota. They're trying to add something to the rules here by their arguments that are not there in a plain reading of Minnesota rules two and three. The Scanlon case is right on point in the strict compliance with those rules. The differential in this this court, on one occasion, addressed a case similar to this in Marshall versus Warwick, but in that case there wasn't the proof that was necessary under the South Dakota statute that service has been made. Here there is. There is the under oath testimony of Thomas. I'm out of time. Thank you, counsel. Thank you. Thank you for your argument this morning.